Herbert, J.,
dissenting. There is no dispute among the members of the court as to the general law applicable to this *484 particular case. While the majority opinion cites 18 American Jurisprudence, 508, Section 112, to the effect that judicial notice may be taken that high-voltage electricity is a very dangerous commodity, and that high-voltage electric wires stretched across public streets constitute a danger to the traveling public, it is also noted in 20 American Jurisprudence, 132, Section 129, that “a court will judicially notice that electricity can be safely conducted and used as an agent for the production of light, heat, and power.”
I agree with paragraph one of the syllabus but dissent from paragraph two and, therefore, the judgment.
In the case of City of Cincinnati v. Correll, 141 Ohio St., 535, 49 N. E. (2d), 412, Bell, J., stated, at page 539, what the writer considers to be a sound summation of the legal principle involved:
“If an enactment is referable to the police power, to be valid, the court must be able to say that it tends in some substantial degree to the prevention of offenses, or the preservation of the health, morals, safety or general welfare of the public. Therefore, if it is apparent that there is no plausible, reasonable and substantial connection between the provisions of the act and the supposed evils to be suppressed, there exists no authority for its enactment.”
The sole issue here is whether the recent ordinance of the city of Euclid requiring electric power lines carrying greater voltage than 33 KV to be placed under ground is a reasonable exercise of the police power of the city. Here, the proposed transmission lines carrying 132,000 volts would be supported on steel towers placed on reinforced concrete footings, with the average height of each tower to be 85 feet. The clearances between the conductor lines and ground levels where they would cross streets would vary from 52 to 64 feet, and each tower would be completely grounded for safety purposes to protect against lightning striking a tower.
Most of the factual evidence presented before the master was undisputed. The master found that an automatic relay
I *485 system would cut off the flow of electricity through the conductors and de-energize the line in about 1/20 of a second if it became damaged or severed, and that before a line could strike the ground it would be rendered harmless. Each line is a little less than one inch in diameter, most of the strands making up the line being aluminum and having an inner core of plow steel which substantially increases the strength of the line but is not itself a conductor of electricity.
The master’s report shows that a wire carrying 33,000 volts is of far less tensile strength than that of a conductor of a 132,000-volt line, and, of course, it is obvious that wooden poles may be blown down by high winds or knocked down, in contrast to the high towers which the relator here proposes to erect entirely on its presently owned right of way.
The master reported that the relator introduced evidence that, “in 1953, the Cleveland area was subjected to a tornado, yet it caused no damage to any of relator’s 132,000 volt steel tower lines. Furthermore, relator’s evidence shows that there are 428 roads and streets which are crossed by 877 single circuit conductors of its existing 132,000 volt lines — 502 of which are within the confines of municipalities — and that its 30 years of record keeping disclose no instances of such lines being down on any roads or streets. It should, perhaps, be mentioned that in comparison with the aforesaid 877 crossings, there will be only 12 such crossings for relator’s proposed tower line in the city of Euclid, of which two circuit crossings are over a ‘paper’ street which is not yet constructed. There is, of course, no danger of trees falling across the proposed line since there are none standing on the right of way along which the line will pass. Relator’s evidence did disclose, however, that in its 30 years of record keeping there were nine instances of accidents affecting its 614.19 circuit miles of 132,000 volt lines. Some of these were most unusual. For example, in 1928 a careless aviator flew into a line and brought down two conductors. In 1929, an oil pipeline near a tower sprang a leak. The oil was ignited by sparks from a passing locomotive and the heat from the *486 oil fire dropped one of the conductors. In 1933, a conductor was brought down by a rifle bullet. In 1955, there were two cases where the lines had been dynamited by vandals. In two instances, not in the Cleveland area, a line came down due to an unusually heavy formation of ice. The evidence discloses, however, that at those times the ultimate strength of the conductors which came down was only 9,000 pounds; that the ultimate strength of the conductors of the proposed line is 25,000 pounds. * * * In none of these instances, except in the case of the aviator, was anyone injured and no person’s property, other than relator’s, was damaged.”
Suffice to say that on the record of the undisputed evidence presented in this particular case, the ordinance under consideration here, which forbids an overhead installation such as proposed with all the modern safeguards, is not sufficiently related to the health, safety and welfare of the inhabitants of Euclid as to be a reasonable exercise of the police power.
A court should not, of course, interpose its judgment as to reasonableness of an enactment above the legislature determination unless the enactment appears clearly unreasonable. Here, the evidence leaves no other conclusion open to the writer.
Each case such as this finally comes down to an issue as to what is a proper balance between public interest and private rights. What the future may hold with respect to atomic energy plants, and perhaps as yet undreamed of developments, is, of course, open to conjecture, but, in the instant case, I would affirm the judgment of the Court of Appeals.
Weygandt, C. J., and Peck, J., concur in the foregoing dissenting opinion.